IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

SANDRA LYNN NORTON,                    )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )        CIVIL ACTION NO. 5:11-00370
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
            Defendant.                 )

M E M O R A N D U M   O P I N I O N

        This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Supplemental Security Income (SSI), under Title XVI of the Social

Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently pending before the Court on  the

parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 12 and 13.) Both parties have

consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 4 and 5.)

        The Plaintiff, Sandra Lynn Norton (hereinafter referred to as "Claimant"), filed an application

for SSI on December 18, 2007 (protective filing date), alleging disability as of October 1, 2007, due

to "bipolar, major depression, suicidal, nervous, panic attacks, [and] anger issues."[1] (Tr. at 8, 100,

101-07, 138.) The claim was denied initially and upon reconsideration.[2] (Tr. at 45-46, 47-49, 59-61.)

On October 17, 2008, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr.

at 62.) The hearing was held on May 10, 2010, before the Honorable William R. Paxton. (Tr. at 24-

_____

        [1] Claimant filed prior applications for Disability Insurance Benefits (DIB) and SSI, under
Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 40 - 433, 1381-1383f, on September 15,
2002, alleging disability as of June 30, 1995. (Tr. st 8.) The claims were denied initially on January
23, 2003, and no further appeal was filed. (*Id.*)

        [2] On her form Disability Report - Appeal, dated May 20, 2008, Claimant alleged internal
derangement of her left knee as an additional disabling impairment. (Tr. at 175.)

44.) By decision dated May 25, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 8-19.) The ALJ's decision became the final decision of the Commissioner on April 21, 2011, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3.) On May 23, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2010). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether

the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2010). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of

the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The

Regulation further specifies how the findings and conclusion reached in applying the technique must

be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written
> decision issued by the administrative law judge and the Appeals Council must
> incorporate the pertinent findings and conclusions based on the technique. The
> decision must show the significant history, including examination and laboratory
> findings, and the functional limitations that were considered in reaching a conclusion
> about the severity of the mental impairment(s). The decision must include a specific
> finding as to the degree of limitation in each of the functional areas described in
> paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2) (2010).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because

she had not engaged in substantial gainful activity since December 18, 2007, the application date. (Tr.

at 10, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from "bipolar

affective disorder; anxiety disorder, NOS; and polysubstance abuse in remission" which were severe

impairments. (Tr. at 10, Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's

impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 12,

Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity to perform a full

range of work at all exertional levels, as follows:

> [T]he undersigned finds that [C]laimant has the residual functional capacity to
> perform a full range of work at all exertional levels. However, the [C]laimant has
> non-exertional limitations. Specifically, the [C]laimant is limited to understanding,
> remembering, and carrying out simple instructions. In addition, the [C]laimant can
> have only occasional interaction with the public.

(Tr. at 13, Finding No. 4.) At step four, the ALJ found that Claimant could not return to her past

relevant work. (Tr. at 17, Finding No. 5.) On the basis of testimony of a Vocational Expert ("VE")

taken at the administrative hearing, the ALJ also concluded that Claimant could perform unskilled

jobs at all exertional levels, such as a.cleaner, laundry worker, and dietary aide. (Tr. at 18, Finding

No. 9.) On this basis, benefits were denied. (Tr. at 18, Finding No. 10.)

<u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was born on June 7, 1955, and was 42 years old at the time of the administrative hearing, May 10, 2010. (Tr. at 17, 28, 101.) Claimant had a high school education and was able to communicate in English. (Tr. at 17, 28, 137, 144.) In the past, she worked as a store clerk. (Tr. at 17, 139, 155-62.)

<u>The Medical Record</u>

The Court has reviewed all the evidence of record, including the medical evidence, and will summarize it below in relation to Claimant's mental impairments, as they pertain to the majority of

her allegations.

*FMRS Health Systems*:

Claimant treated at FMRS Health Systems ("FMRS") from January 14, 2006, through March 4, 2008. (Tr. at 213-39.) On January 14, 2006, Dr. Omar Hasan performed a psychiatric evaluation and diagnosed major depression, biopolar in nature, with paranoid ideations; history of panic disorder; history of substance abuse; and assessed a GAF of 25-30. (Tr. at 225.) She had a continuing diagnosis of bipolar disorder and consistently had no suicidal or homicidal ideations, with the exception on January 16, 2007, before her Zoloft was discontinued and switched to Prozac, and on October 26, 2007, when she reported she had attempted suicide twice. (Tr. at 215, 223.) Claimant was then admitted to the Crisis Unit for stabilization. (Tr. at 223.) It was noted that her mood was more stable with medication (Tr. at 218.) On October 29, 2007, polysubstance abuse was added to her diagnoses. (Tr. at 228.) In 2008, her mental status exams revealed an absence of suicidal or homicidal ideations, an absence of auditory or visual hallucinations, fair insight and judgment, linear and goal directed thought processes, and appropriate dress and hygiene. (Tr. at 233-39.) It was noted that Claimant was doing well on medication. (Id.)

*Sunny S. Bell, M.A.*:

Ms. Bell, a licensed psychologist, performed a clinical interview and mental status examination on March 10, 2008, wherein Ms. Bell observed that Claimant was generally pleasant and cooperative and easily established rapport. (Tr. at 240-47.) Claimant reported depression, crying episodes, decreased energy, sleep difficulties, irritability, decreased libido, feelings of hopelessness and helplessness, feelings o worthlessness and uselessness, low self-esteem, concentration difficulties, difficulty making decisions, memory problems, and being withdrawn and apathetic. (Tr. at 241.) Claimant also reported manic phases accompanied by racing thoughts, inability to sleep,

increased energy, feelings of grandiose, becoming more talkative and volatile, and spending money unwisely. (Id.) She reported two suicide attempts by overdose in October, 2007, but denied current suicidal or homicidal ideation. (Id.)

On mental status exam, Claimant was cooperative and motivated, interacted in a socially appropriate manner, spontaneously generated conversation, exhibited a good sense of humor, maintained good eye contact, appeared comfortable, exhibited relevant and goal-directed speech, was oriented fully, presented with logical and organized thought processes, reported no obsessions or delusions, had normal judgment, had normal immediate and remote memory, had moderately deficient recent memory, had normal concentration, and exhibited no gross psychomotor difficulties. (Tr. at 243.) She did report auditory hallucinations. (Id.) Ms. Bell diagnosed bipolar disorder NOS; cannabis abuse, early full remission; and opioid abuse, early full remission. (Id.) Claimant reported her activities to have included eating, watching television, reading, managing her personal care, doing housework, cooking, doing dishes and laundry, shopping, doing yard work, driving and running errands, playing the guitar, managing her finances with the help of her friend, and managing a checkbook. (Tr. at 244.) Ms. Bell assessed normal social functioning, persistence, and pace. (Id.)

_Dr. Mustafa Rahim, M.D._:

Dr. Rahim examined Claimant on March 14, 2008, for complaints of psychiatric issues, including past suicidal attempts, bipolar disorder with anxiety, anger issues, and feelings of weakness and fatigue. (Tr. at 248-52.) Claimant denied suicidal or homicidal thoughts or ideations. (Tr. at 248.) Dr. Rahim observed that Claimant was oriented and had normal speech and intact memory. (Tr. at 249.) He diagnosed bipolar disorder, anxiety, status post suicidal attempt, and anger issues. (Tr. at 250.)

_Appalachian Regional Healthcare ("ARH")_:

Claimant was admitted to ARH on June 20, 2008, with complaints of mania and psychosis. (Tr. at 277-89.) She report racing thoughts, voices in her head, and thoughts of suicide. (Tr. at 277.) Her urine drug screen was positive for benzodiazepines. (Id.) On exam, Claimant was alert and oriented, cooperative, seemed a little distressed, maintained eye contact, spoke normally, had linear and goal directed thought processes, admitted to suicidal thoughts but no plan, reported auditory hallucinations, had limited insight and judgment, and had average cognitive functioning. (Tr. at 279.) She was diagnosed with bipolar disorder, most recent episode mixed with psychotic symptoms; and a history of polysubstance abuse, and was assessed a GAF of 20. (Tr. at 279-80.) Claimant was admitted to the locked psychiatric unit and was scheduled for intrapersonal, group, and milieu therapy while in the unit. (Tr. at 280.)

Claimant was discharged from the psychiatric unit on June 27, 2008, with diagnoses of major affective disorder, bipolar in nature, mixed affective state with paranoid ideations, and was assessed a GAF of 50, which indicated borderline moderate symptoms. (Tr. at 282-83.)

Claimant again was admitted to ARH on October 7, 2009, with complaints of mental status changes. (Tr. at 354-65.) She was unable to ambulate and was increasingly confused and paranoid. (Tr. at 360.) She was examined by Dr. Hasan. (Id.) Mental status exam revealed that Claimant was cooperative, oriented to person and place, exhibited variable speech, had a dysphoric affect, had decreased levels of anxiety and psychomotor activity, presented with poor insight and judgment, and was of average intelligence. (Tr. at 361.) Dr. Hasan noted that Claimant had significant paranoia. (Tr. at 362.) Dr. Hasan diagnosed bipolar affective disorder, most recent episode depressed with psychotic features; anxiety NOS; delirium, likely secondary to medications; and assessed a GAF of 35. (Tr. at 361-62.) He placed her in the inpatient psychiatric unit and adjusted her medications. (Tr. at 362.)

9

Claimant was discharged on October 12, 2009, with diagnoses of syncope of unclear etiology, possibly secondary to infectious cause versus polypharmacy; urinary tract infection; low thyroid stimulating hormone with normal free T4; hypertension controlled; obesity controlled; and bipolar requiring inpatient admission. (Tr. at 354.)

_Dr. Omar Hasan, M.D._:

Upon examination on April 2, 2008, Dr. Hasan observed that Claimant was dressed casually and had good grooming, was pleasant and cooperative, was alert and oriented, exhibited normal speech, had a dysphoric affect and not too good mood, had a slightly increased level of anxiety and psychomotor activity, had some mild paranoia, had logical and linear thought processes, denied suicidal or homicidal ideations, denied hallucinations, had fair to poor judgment and insight, and was of average intelligence. (Tr. at 336.) Dr. Hasan diagnosed bipolar affective disorder versus schizoaffective disorder and assessed a GAF of 50. (Tr. at 337.)

Dr. Hasan completed a form Medical Assessment of Ability to Do Work-Related Activities (Mental) on July 18, 2008, wherein he opined that Claimant had poor ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, maintain attention and concentration, relate predictably in social situations, demonstrate reliability, and understand, remember, and carry out complex and simple job instructions. (Tr. at 291-94.) He further opined that Claimant had fair ability to follow work rules, use judgment, function independently, maintain personal appearance, behave in an emotionally stable manner, and understand, remember, and carry out complex job instructions. (Id.) Dr. Hasan checked that Claimant was able to manage benefits in her own best interest, but did neither identified the evidence nor limitations that supported his assessment (Id.)

On January 14, 2009, Claimant reported that she was doing well, denied auditory and visual

hallucinations, reported that she was caring for her dogs and that she felt more optimistic, and denied suicidal or homicidal ideation. (Tr. at 324.) Dr. Hasan diagnosed bipolar affective disorder and anxiety NOS. (Id.) Claimant reported on February 11, 2009, a decreased ability to sleep, crying spells, an increased level of anxiety, visual hallucinations, and intermittent thoughts of harming herself. (Tr. at 325.) Dr. Hasan diagnosed bipolar affective disorder and admitted Claimant to the hospital. (Id.) After her discharge from the hospital, Claimant reported on February 25, 2009, that she was not sure what happened but was discharged from the hospital because she had improved. (Tr. at 326.) Dr. Hasan diagnosed bipolar affective disorder and anxiety NOS. (Id.) He opined that Claimant was not "acutely suicidal, homicidal, or psychotic and [did] not warrant acute psychiatric admission." (Id.)

Dr. Hasan noted that Claimant was doing fair on March 10, 2009, with an increased level of anxiety. (Tr. at 327.) She was not leaving her house, had decreased ability to sleep, and denied hallucinations, as well as suicidal or homicidal ideations. (Id.) On April 7, 2009, Claimant had decreased ability to sleep and fair mood. (Tr. at 328.) Dr. Hasan diagnosed bipolar affective disorder and anxiety NOS. (Id.) Claimant reported on June 2, 2009, a fair mood, an increased level of anxiety, and a decreased ability to sleep. (Tr. at 352.) She reported that she had returned to playing music. (Id.) Dr. Hasan diagnosed bipolar affective disorder, anxiety NOS, and history of substance dependence. (Id.) Dr. Hasan again noted on July 22, 2009, that Claimant "was not acutely suicidal, homicidal or psychotic and [did] not warrant acute psychiatric admission. (Tr. at 353.)

Claimant reported on August 18, 2009, that she was not doing well, had a decreased mood, had thoughts of harming herself by cutting her wrists, and was worried over her medical bills. (Tr. at 366.) Dr. Hasan diagnosed bipolar affective disorder and noted that Claimant's condition did not warrant psychiatric admission, but nevertheless admitted her to the hospital secondary to her

11

increased depressive symptoms and thoughts of wanting to cut her wrists. (Id.)

On November 2, 2009, Claimant reported Dr. M.K. Hasan, M.D., increased levels of anxiety but that she had done better since discharged from the hospital. (Tr. at 367.) Claimant reported that she was doing fairly well most of the time and Dr. Hasan noted that she was stable with medication. (Id.) She was sleeping and eating well and denied suicidal or homicidal ideations, hallucinations, or delusions. (Id.) Dr. Hasan observed that Claimant was cooperative and relevant, appeared her stated age, maintained eye contact, was oriented, had normal speech and stable mood, her affect was euthymic, had logical thoughts, normal psychomotor, and fair insight and judgment. (Id.) Dr. Hasan diagnosed major depression, bipolar type with psychotic features. (Id.) He encouraged Claimant to become involved in a hobby, exercise routine, or church activity. (Id.)

*Chestnut Ridge Hospital*:

Claimant was hospitalized at Chestnut Ridge Hospital from June 17, 2009, through June 26, 2009, for electroconvulsive therapy ("ECT") as suggested by Dr. Hasan. (Tr. at 341-48.) Claimant reported that she was quite depressed and unable to sleep. (Tr. at 345.) She reported decreased interest, energy, and ability to concentrate; guilt; suicidal thoughts; a constant sense of anxiety; that she did a lot of acid; and auditory hallucinations of her unborn baby telling her to kill herself. (Id.) On mental status exam, her mood was depressed and her affect was incongruent, she appeared euthymic, thought processes were linear and goal directed, she denied hallucinations but reported that she experienced them on a regular basis, and her insight and judgment were poor. (Tr. at 347.) She was diagnosed with bipolar I disorder, chronic, recurrent, depressed phase with psychosis; post traumatic stress disorder; polysubstance abuse; and was assessed a GAF of 40. (Id.)

Claimant was given bilateral ECT treatment on June 18, 2009, and her auditory hallucinations disappeared after one treatment and her mood significantly disappeared. (Tr. at 343.) Her discharge

diagnoses were mood disorder NOS; polysubstance abuse; and provisional diagnosis of major depressive disorder, severe, recurrent with psychotic features. (Tr. at 342.) She was assessed a GAF of 45-50 on discharge. (Id.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to give controlling weight to the opinion of her treating physician, Dr. Hasan, regarding the limitation imposed by anxiety and bipolar affective disorder and schizoaffective disorder. (Document No. 12 at 16-19.) Claimant asserts that the ALJ failed to provide any rationale for finding that Dr. Hasan's limitations were not supported by the record. (Id. at 16.) Claimant contends that the ALJ does not possess any medical expertise, and therefore, improperly discounted Dr. Hasan's opinion as having been unsupported by clinical findings. (Id. at 17.) Claimant further asserts that the ALJ erred in failing to develop the record fully as to how her drug and alcohol use affected her functional capacity. (Id. at 19.)

In response, the Commissioner asserts that the ALJ properly rejected Dr. Hasan's severe limitations because his opinion was rendered when Claimant was still using drugs and alcohol; he failed to provide a basis for his opinion, which consisted of a check-list form; and his assessment was inconsistent with his most recent treatment note of February 12, 2010, which indicated that Claimant was stable with treatment. (Document No. 13 at 16-17.) The Commissioner asserts that Dr. Hasan examined and treated Claimant on numerous occasions, but failed to provide any support for his extreme limitations on his check-list assessment. (Id. at 17.) Furthermore, the Commissioner asserts that Dr. Hasan's opinion was in sharp contrast with his check-list assessment. (Id.) During the course of Dr. Hasan's treatment of Claimant, he consistently reported positive mental status exam findings and no symptoms that warranted acute psychiatric admission. (Id. at 17-18.) The Commissioner notes

13

that most significantly, on February 12, 2010, Dr. Hasan reported that Claimant was stable with medications and would continue to do well if she avoided illicit drugs and alcohol and remained compliant with her medication regimen. (<u>Id.</u> at 18.) The Commissioner also asserts that the evidence from the other medical providers also failed to support Dr. Hasan's extreme limitations, particularly, the notes from FMRS, Dr. Bell's evaluation, and Dr. Rahim's findings. (<u>Id.</u> at 18-19.) Although Claimant required in-patient hospitalizations at times, she quickly responded to treatment and her hospital stays were brief. (<u>Id.</u> at 13.) The Commissioner notes that her various mental status exams consistently revealed normal, or near normal findings. (<u>Id.</u>) The Commissioner notes that Claimant's credibility was not entirely credible as the testimony as to her daily activities was inapposite to the activities reported on claim forms and to her various mental health providers. (<u>Id.</u>) Accordingly, the Commissioner contends that the ALJ's decision to not accord controlling weight to Dr. Hasan's opinion was supported by substantial evidence of record. (<u>Id.</u> at 19.)

<u>Analysis</u>.

<u>Treating Psychiatrist's Opinion</u>.

Claimant alleges that the ALJ failed to give appropriate weight to the opinions of his treating psychiatrist, Dr. Hasan. (Document No. 12 at 16-19.) "RFC represents the most that an individual can do despite his or her limitations or restrictions." <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2010). "This assessment of your remaining capacity for work is not a

14

decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2010).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your

15

residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2010). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2010). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given

to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2010). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). Ultimately, it is the responsibility of

17

the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

In his decision, the ALJ summarized Dr. Hasan's opinion of July 18, 2008, and rejected his extreme limitations because his opinion was rendered when Claimant was still using drugs and alcohol. (Tr. at 17.) The ALJ also rejected the opinion because he failed to provide a basis for his opinion and completed only a check-list form. (Id.) Finally, the ALJ found that Dr. Hasan's opinion was inconsistent with Dr. Hasan's most recent treatment note of February 12, 2010, which indicated that Claimant was stable with treatment. (Id.) The Court finds that the ALJ's decision not to give significant weight to Dr. Hasan's opinion is supported by substantial evidence of record.

Though Dr. Hasan was Claimant's treating psychiatrist, his July, 2008 he failed to substantiate his opinion with references to his treatment notes documenting the impairments and Claimant's specific limitations resulting from her mental impairments. It was clear that at times throughout his treatment of Claimant, she had instances in which she required inpatient hospitalization. Upon admission however, Claimant's condition consistently improved and she was discharged within a short period of time. Dr. Hasan's treatment notes and the other evidence of record demonstrate that Claimant responded to the medication and at most times, was doing well with medication. Dr. Hasan's final treatment note in February, 2010, indicated that Claimant was stable with medication, which is in direct conflict with his 2008 assessment. Contrary to Claimant's

18

assertion, the ALJ was permitted to examine the evidence of record and conclude that Dr. Hasan's opinion was inconsistent with his treatment notes and the other evidence of record. The record demonstrates that Claimant was doing well with medication and in the absence of specific limitations noted in his opinion to support his limitations, the ALJ properly rejected Dr. Hasan's extreme limitations in light of the entire evidence of record. Accordingly, the Court finds that the ALJ's decision is supported by substantial evidence of record.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 12.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 13.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

.       The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: September 28, 2012.

R. Clarke VanDervort
United States Magistrate Judge